1                      IN THE UNITED STATES DISTRICT COURT

2                      IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -
      XCOAL ENERGY & RESOURCES,              :  CIVIL ACTION
4                                            :
                   Plaintiff,                :
5      v                                     :
                                             :
6      SOUTHERN COAL SALES CORPORATION, A&G COAL    :
      CORPORATION, VIRGINIA FUEL CORPORATION, TAMS:
7      MANAGEMENT, INC., BLACK RIVER COAL, LLC,    :
      JUSTICE LOW SEAM MINING, INC., SOUTHERN COAL:
8      CORPORATION, and JAMES G. JUSTICE, II,      :  NO. 14-459-LPS
                                             :
9                   Defendants.
                                  - - -
10
                            Wilmington, Delaware
11                         Tuesday, August 25, 2015
                            *Oral Argument Hearing*
12
                                  - - -
13
      BEFORE:          HONORABLE **LEONARD P. STARK**, Chief Judge
14
      APPEARANCES:                     - - -
15

16              BUCHANAN INGERSOLL & ROONEY, PC
                BY:  GEOFFREY G. GRIVNER, ESQ.
17
                        and
18
                BUCHANAN INGERSOLL & ROONEY, PC
19              BY:  KEVIN P. LUCAS, ESQ.
                      (Pittsburgh, Pennsylvania)
20
                        Counsel for Plaintiff
21

22              POTTER ANDERSON & CORROON, LLP
                BY:  JESSE L. NOA, ESQ.
23
                        and
24

25                                  Brian P. Gaffigan
                                    Registered Merit Reporter

```
 1   APPEARANCES:  (Continued)

 2
                     WILLIAMS MULLEN, LLP
 3                   BY:  WILLIAM D. BAYLISS, ESQ.,
                          BRENDAN O'TOOLE, ESQ., and
 4                        JOSEPH E. BLACKBURN, III, ESQ.
                          (Richmond, Virginia)
 5
                              Counsel for Defendants
 6

 7

 8

 9

10

11                            - oOo -

12                     P R O C E E D I N G S

13             (REPORTER'S NOTE:  The following oral argument

14   hearing was held in open court, beginning at 3:13 p.m.)

15             THE COURT:  Good afternoon.

16             (The attorneys respond, "Good afternoon, Your

17   Honor.")

18             THE COURT:  I'll have you put your appearances

19   on the record for us, please.

20             MR. GRIVNER:  Good afternoon, Your Honor.

21   Geoffrey Grivner of Buchanan Ingersoll & Rooney.  And on

22   behalf of plaintiff Xcoal and with me today is my colleague,

23   Kevin Lucas of our Pittsburgh office.  With Your Honor's

24   permission, he will be presenting.  He has been admitted pro

25   hac vice.
```

1           THE COURT:  That is certainly fine.

2           Welcome.

3           MR. LUCAS:  Thank you, Your Honor.

4           MR. NOA:  Good afternoon, Your Honor.

5           THE COURT:  Good afternoon.

6           MR. NOA:  Jessie Noa from Potter Anderson &

7   Corroon on behalf of defendants.  With me are my colleagues

8   from Williams Mullen, Mr. William Bayliss, Mr. Brendan

9   O'Toole, Mr. Joseph Blackburn, all whom have been admitted

10  pro hac vice.

11          We also have with us from Southern Coal, Mr.

12  Tom Lusk.

13          THE COURT:  Okay.

14          MR. NOA:  With Your Honor's permission Mr.

15  Bayliss will be speaking on behalf of defendants today.

16          THE COURT:  That's fine.  We're here for

17  arguments on the plaintiff's motion.  That is entitled a

18  motion to clarify collateral obligations.

19          I thought it would be helpful for you to hear my

20  thoughts initially, and then I'll certainly give plaintiff a

21  chance to help me understand where I'm wrong, but the motion

22  to clarify is at least an unusual animal.  I'm not quite

23  sure what it is honestly from a procedural perspective.

24          As I was reading the materials, it seemed like

25  perhaps this is a motion for reconsideration of the denial

1    of the TRO, but, of course, that would be untimely and I

2    would deny it at this point if that is what it was.

3              Then I thought, well, maybe it is a request, a

4    new request for a TRO or a preliminary injunction.  But, of

5    course, the plaintiffs say in the briefing very studiously

6    it is not that and that we're not alleging irreparable harm

7    right now and certainly if they said otherwise, the four

8    factors are not set out and even addressed much less proven

9    in the briefing.  So I would deny that if that is what it

10   was.

11             So I take it what it is, is essentially a motion

12   for partial summary judgment, and that is what the plaintiff

13   tells us in the reply brief, that they see this as being

14   akin to, although not in the opening brief.  So it is

15   unclear to me as I read the opening brief.  In fairness, it

16   is probably unclear to the defendants as they prepared their

17   response what exactly this was.

18             But to the extent it is now to be viewed as a

19   motion for partial summary judgment, I think it should

20   denied that as well because the scheduling order has a date

21   for summary judgment motions, and it says quite clearly I

22   think don't file them more than 10 days before this date

23   without leave of the Court which was not sought.

24             Beyond that, I understand from where discovery is

25   that if the defendants had fair notice that this is a summary

1    judgment motion, they would file a Rule 56(d) affidavit and

2    say here is the material disputed facts.  Don't deal with

3    this now.  And my guess is that would be a pretty strong

4    argument.

5          So it seems to me rather than spend a whole lot

6    of time talking about who may have breached and who may have

7    misunderstood the import of any prior rulings by this or

8    any other court, maybe for today's purposes I should just

9    say that whatever it is, it's procedurally improper, it's

10    denied, and let's move on.

11          So that is where I'm coming from.  Again, we're

12    here, and I'll certainly listen to an argument as to why

13    that analysis is wrong.  But let's focus on that before we

14    may or may not get into the rest of the legal issues.

15          So with that, we'll turn it over to the

16    plaintiff, I guess Mr. Lucas.

17          MR. LUCAS:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. LUCAS:  Thank you.  You have given me a

20    large hill to climb.

21          THE COURT:  Go ahead and climb it.

22          MR. LUCAS:  Let me try to do that, because it's

23    not the things you've said initially that it is probably

24    not.  It's not.  It's not an intent to have you reconsider

25    what you did at the initial stage when we had multiple

1    motions, including the TRO.  We tried to make that clear in

2    the initial brief.  If we didn't do that, my apologies, and

3    the nomenclature would be mine as well, Your Honor.

4              It's clearly an unusual motion.  I certainly

5    acknowledge that.  We tried, because of the nature of the

6    defendant's response in the reply brief, to address this,

7    but to give it some context, not thinking in the context

8    that you are talking about, because we certainly weren't

9    considering or attempting to put the defendants at some sort

10   of procedural disadvantage.

11             I could, based upon my view of the matters,

12   could characterize it in a number of different ways, one

13   of which you did and we did sort of in a reply brief, to put

14   it in some context, it's like a partial motion for summary

15   judgment motion.

16             What it is, if you look at the requested for

17   relief, and maybe we start there and then address your

18   issues, it is a request for a determination or a ruling by

19   this Court that Xcoal is withholding a payment for coal or

20   any other alleged brief under the coal supply agreement

21   does not excuse or reduce the obligation of defendants to

22   maintain collateral under the letter agreement.  I mean that

23   is what it is.

24             I guess I could characterize it, Your Honor, as

25   a motion for judgment on the pleadings, equally characterize

1   it as that.  I could equally characterize it as any interim

2   motion.  But it really was an effort to try to have an issue

3   that is of importance to us, an issue that this Court has to

4   address in this case in any event, an issue which we do not

5   believe there is any potential factual dispute, genuine

6   factual dispute, that would prevent a ruling at this point

7   in time, that is what we were intending to do.

8           I think I said either in the briefing or

9   perhaps at another point in time that in the event that the

10  Court were to determine that the defendants here did not

11  have a right to reduce their collateral obligations under

12  the circumstances, quite frankly, I would expect that the

13  defendants would do the right thing and they would maintain

14  replenish the collateral.

15          You had said at our earlier initial argument

16  that you might be convinced of an entitlement to injunctive

17  relief.  You might reconsider at some point if we wanted to

18  come back, and we're not here today to ask you to issue

19  injunctive relief.  If the determination were made, we would

20  hope that the defendants would do the right thing.  We

21  think the violation.  And we've cited to the Court cases --

22  violation of the collateral agreements, in and of itself,

23  is in irreparable harm.  But if it turned out based on

24  discovery that we thought we wanted to come back and seek

25  injunctive relief we would do so.

1          So the real question from my point of view that

2     I need to respond to you is, if I were you, I would look at

3     me as you essentially have done in different language and

4     saying so why are we here?  Mr. Lucas, why did you bring us

5     all together here?

6          And the issue on that, Your Honor, is really

7     this is a matter, this question, the issue we have presented

8     for a determination, is an issue in this case that exists

9     separate and distinct from any injunctive relief, any TRO,

10    or anything of that nature.

11         The complaint that has been filed in the

12    original Delaware action by Xcoal has multiple counts

13    including breach of the coal supply agreement, breach of

14    the letter agreement, and breach of the guaranty agreement.

15         At the time, prior to the time that the

16    defendants, in or about April the 10th of 2014, terminated

17    immediately the agreement, they had been put on notice that

18    they had committed a default under the letter agreement and

19    were in violation of the letter agreement in terms of their

20    obligation to maintain collateral.

21         So this is a nonjury case, as we've made clear

22    to the judge any number of times.  This is an issue that you

23    are going to be presented with in deciding this case in any

24    event, Your Honor.  It's an issue that is part of the

25    complaint.

1          Now, summary judgment, again, this is really

2     not something that we believe -- I realize the Court may

3     disagree, but it is not something we believe is a matter

4     that could be the subject of a genuine factual dispute.

5          And if I could step back and put that in

6     context, Your Honor.  One of the points I wanted to make

7     for you today, and I think it really is responsive to your

8     question in a way, is that the determination on the issue

9     that we present by this motion is not something that should

10    be controlled by or reach the same result as a similar issue

11    that we addressed two weeks ago in our telephone conference

12    in the motion to amend context of the other suit, what we

13    have been calling the transferred Virginia suit.

14          If you recall in that case, Your Honor, the

15    question was Your Honor allowed the plaintiff to amend its

16    complaint in that case, but one of the issues was that at

17    this point in time, the Court did not feel comfortable,

18    based upon the documents, at least as I understood your

19    comments, based upon the documents to be able to say it was

20    a question of law as to whether or not performance or lack

21    of performance under the coal supply agreement was relevant

22    for the issues of either was there a lack of consideration

23    for the mutual release or was there a breach of the mutual

24    release?

25          Now, this is different.  In fact, this is like,

1    if I may, the other part of Judge Ballou's ruling in the

2    report and recommendation on the conflicting venue provisions.

3    There, Judge Ballou, as he put in the opinion, looked at the

4    provisions and said there is a clear contrary intent by the

5    parties as to what they intended to do.  There was a clear

6    intent by the parties as to what they intended to do.  So

7    these are sophisticated parties who negotiated and they

8    specifically addressed the issue of venue.

9              And in that case, as you recall, there was a

10   venue for the coal supply agreement before Your Honor.

11   There was a venue, contractual venue selected under the

12   mutual release for the Western District of Virginia.  He

13   said I have this, I am looking at this, I can decide this

14   now.  This is a matter that goes, because it really relates

15   to a breach of the coal supply agreement, to Your Honor

16   here in Wilmington.

17             In this particular case, unlike that situation,

18   unlike the motion to dismiss, the question of remedy that

19   we're talking about here in default is specifically

20   addressed in these agreements, Your Honor.  It's not like we

21   talked about two weeks ago that, okay, I'm going to look at

22   these two agreements.  I'm not quite sure what the parties

23   intended at this point.  I don't feel comfortable deciding

24   that at this point in time perhaps.

25             This is different.  This is different where the

1    definitions of default, and if it is a default, and what

2    remedies the parties get are specifically addressed in the

3    two agreements.  And so in my mind, again, in response to

4    your question, then, Your Honor, it's not a question of

5    fact, it's a matter of law to be decided, that the Court

6    should decide based upon a looking at the four corners of

7    the two documents in question and applying them like Judge

8    Ballou did with respect the competing venue provisions and

9    like we indicate the governing law of New York requires

10   for the reasons we discussed in the brief.

11            So this is a long-winded way to say to you,

12   Your Honor, it's not a request to ask you to reconsider for

13   injunctive relief.  We're not at that point in time.  We

14   may come back at some point in time.

15            I would hope we never have to.  That the

16   defendants would comply with their collateral obligations if

17   the determination were made that the alleged breach by Xcoal

18   does not allow them under the parties contracts to reduce

19   their obligations.

20            But it is an important issue to decide in terms

21   of the underlying questions in this case.  And it is an

22   issue that, if decided now, will be something that will

23   impact the discovery, if decided in our favor, favorably

24   impact the discovery by reducing the scope and will

25   eliminate a later issue that this Court is going to be

1    presented with in any event because the complaint involves

2    breaches, alleged breaches of the coal supply agreement,

3    of the letter agreement, and of the guaranty agreement by

4    these defendants.

5            Like I said, Your Honor that is the genuine

6    answer to your question.  I didn't think, never really

7    considered in terms of proper procedural context, and I

8    certainly wouldn't want the defendants to be prejudiced

9    in any way.  I doubt they were, but I wouldn't want them,

10   in terms of having thought or not realized this could be

11   characterized as somewhat as the equivalent of a summary

12   judgment motion.

13           But as I said, if I really had to, in response

14   to your question, I think it's more quote-unquote a motion

15   for judgment on the pleadings to address an issue that

16   can be addressed as a matter of law without discovery and

17   therefore presented to the Court at this time, which I think

18   will be to the benefit of the entire proceeding.

19           Does that answer your question, Your Honor?

20           THE COURT:  That does.  That's helpful.  Let me

21   ask you a few more things, and then we'll give defendants a

22   chance to speak, and then we'll see where we go from there.

23           I recall, it's been a long two weeks, for me at

24   least, but I recall that there has been throughout this case

25   or these cases an issue as to whether or not these various

1    agreements should be read as one or as multiple agreements.

2    And as I was reading the briefing for today, it seemed to

3    me like that issue was again implicated and could be seen

4    as at least in part intertwined with some factual disputes.

5           If I understand what you are saying to me now,

6    though, your view is even if one might think that for some

7    purposes these should be viewed as separate agreements or

8    even if one thinks they should be viewed all as a single

9    agreement, that is not something I need to resolve in order

10   to give you the relief you are seeking by your motion to

11   clarify.  I just need to focus, if I were to do it, on what

12   the default or remedy provisions are.  Is that right?

13           MR. LUCAS:  I think that is right, Your Honor.

14   I'll readily acknowledge that the way I have been viewing

15   what has happened over the past several weeks, that for

16   different purposes, the Court could look at these matters

17   differently.  And, remember, first, although you may or

18   may not find it significant, the two documents that we're

19   referring to today are different than the two documents we

20   were talking about two weeks ago, the mutual release and the

21   coal supply agreement.  This is the coal supply agreement

22   and the letter agreement.

23           That's not without significance.  It's not I'm

24   trying to make a distinction without a difference.  And that

25   is, I think it really is what I indicated to Your Honor,

1    which you may accept, you may not.  And it's similar I would

2    say for any reading in trying to figure out what Judge

3    Ballou had in mind in his Report and Recommendation.  You

4    mentioned that at our last hearing.  I recall you saying to

5    me, well, didn't Judge Ballou say something on his view and

6    doesn't that have some implication?  I remember telling you

7    it is true.  I didn't know exactly what he meant because we

8    didn't go back after the oral argument.  But I do know this.

9    I do know he looked at two of the agreements, the mutual

10   release and coal supply agreement, and they had different

11   venue provisions.  And he looked at the venue provisions

12   and he said these are sophisticated parties.  If they wanted

13   to say that, if they wanted to give an answer or say this

14   was the situation, they would have done so.  They didn't.

15          If they wanted to say, if they wanted to challenge

16   the mutual release, the effectiveness of the mutual release

17   on the grounds of failure to fully perform the coal supply

18   agreement, they could have said that and they didn't.  So he

19   was dealing two agreements that addressed the specific issues.

20          Two weeks ago, when we talked to Your Honor, we

21   were addressing two agreements, those same two agreements,

22   but did not address the specific issue, at least as I under-

23   stood Your Honor, where you felt comfortable that based

24   upon the four corners of the language you could make that

25   determination.  At least as I recall, you may be convinced

1    of that at some point in time, but at this point in time,

2    you were going to allow them to amend, and if we wanted to

3    bring it back to you on a motion to dismiss, we could.

4          But that was one where nobody could say, well,

5    look, both agreements specifically addressed the issue about

6    whether -- I mean there was no specific provision governing.

7    This is the situation much like the competing venue provisions.

8    If you look at the two, there are specific provisions.

9    They are nonreciprocal default provisions, cross default

10   provisions.  It's easy to get really sloppy in a situation

11   like this and talk about breach, a breach of one gives

12   rights on the other.  That is not what these agreements say.

13   These are defined terms of default, specifically defined

14   terms, and the question is not, they're not as we spelled

15   out in the briefs.  They are not reciprocal.  They don't

16   give the parties the same rights, and there is nothing that

17   says in either one that if there is a nonpayment under the

18   coal supply agreement here for justification or that had

19   been advanced, but in any event, a breach under the coal

20   supply agreement constitutes some sort of a notice of

21   default or an event of default, I am sorry, an event of the

22   default under the letter agreement that allows you to reduce

23   the collateral obligations.  It doesn't say that.  It has

24   specific reasons.

25          So you look at them, and I believe, and the

 1    cases that we have cited to Your Honor we believe fully

 2    support, that this was specifically covered by the parties.

 3    These are nonreciprocal cross default provisions with

 4    differing remedies, none of which provide the defendants

 5    with the remedy they have taken upon themselves, and that is

 6    we'll take the $20 million under the letter agreement, thank

 7    you very much, but now we're not going to maintain the

 8    collateral which they admit, under the circumstances, needs

 9    to be $10 million, needs to include $10 million in stock

10    value.

11              So that is the argument, Your Honor.  You

12    may disagree.  You may say, well, no, I still think that

13    requires, raises factual issues.  And I would certainly try

14    to talk you out of that, and we tried to do it in our brief

15    based upon the case law, the New York case law which we

16    thought was pretty clear, when it is covered by the two

17    agreements, you look at them, no remedy, this remedy that

18    they have taken on to themselves is not provided.  Therefore,

19    you look at this as a matter of law based upon the four

20    corners of the two agreements and then make that determination

21    that they don't have a right to reduce their collateral

22    obligations under the letter agreement due to an alleged

23    breach -- not even an alleged event of default, an alleged

24    breach under the coal supply agreement.

25              THE COURT:  Thank you.  We will come to you for

1    at least a little bit.  We may come back to you at length,

2    we'll see, but let me give the defendant a chance to be heard.

3              MR. BAYLISS:  Your Honor, it's good to meet you.

4    Bill Bayliss on behalf of the Justice Companies and Justice

5    defendants.

6              THE COURT:  Good afternoon.

7              MR. BAYLISS:  I'll try to address your statements,

8    and part of me wants to sit down and shut up because I can

9    only stick my foot in my mouth if I do that after your

10   statements, but I do want to take this opportunity as I think

11   it is important.

12             I heard Mr. Lucas said if you make this decision

13   now, you will eliminate a lot of discovery.  Well, what it

14   will eliminate is hearing the story of this case.  What he has

15   asked for is clear and unequivocally a summary judgment, and

16   all you have to do is read the prayer of what he asked for.

17   And I heard him say something about a motion for judgment on

18   the pleadings, but he relies on Mr. Lusk's testimony, so it is

19   not appropriate to call it that either.

20             I'm not saying I'm blaming him.  I am blaming

21   him for the way he got to this when he starts out with a

22   motion to clarify.  Because that started a long time ago

23   with the Magistrate Judge that has been designated for

24   settlement purposes and who wouldn't hear it unless we both

25   agreed to it, and we didn't know what kind of animal it was

1      either, and we still don't really know.

2                  I think I know what he was trying to do.  And

3      he was trying to get some sort of advisory opinion out of

4      you that kind of gave some direction as to how to take this

5      case.  But I think, Judge, to put all this in context, I'd

6      like to spend about three or four minutes to make sure.  And

7      we came in after the fact, we didn't create the facts, nor

8      did we file the original lawsuit, and so we have what was

9      before us.

10                 What you have is the underlying case going back

11     to 2012 where Justice and Thrasher had a dispute.  And it

12     was a big time dispute with hundreds of millions of dollars

13     at issue.  And you haven't heard anything about that case

14     and heard why it was resolved, which I think is important

15     when you have the opportunity to hear it all.  But it was

16     resolved by a mutual release, contemporaneously signed with

17     a coal supply agreement and contemporaneously signed with a

18     letter agreement, both of which were attached to the mutual

19     release.

20                 And when I have tried to think of how I could

21     describe this to you, there was so much money involved in

22     the underlying matter, it would literally put people out

23     of business, it would bankrupt people.  That this was a

24     creative creditor rights workout situation, and I think

25     it was very creative.

```
 1              I think if you look at the context of the
 2    agreement and what the parties agreed to in the underlying
 3    matter, it was a good agreement.  And it's unfortunate we
 4    stand before you today having had it fall apart within
 5    months of it being inked which is at the heart of what our
 6    case is all about, but it was an agreement that quite simply
 7    allowed a workout arrangement.
 8              In a nutshell, a whole lot of coal was going to
 9    be sold by the Justice Companies.  Mr. Thrasher is a very
10    large broker, had markets available to him that none other
11    had to him.  He would make a whole lot of money if all this
12    coal was sold.
13              $20 million was structured, and you haven't
14    heard anything about how this letter agreement came in
15    place, in a manner at the request of the Thrasher parties,
16    unlike a simple settlement where I breached the contract,
17    owe you a lot of money and I will pay you part of it and
18    we'll go home.  And that is, I'm going to sell $15 million
19    tons of coal, $20 million is going to be loaned to you under
20    a letter agreement, and it's not to be repaid by Justice,
21    it's going to be repaid under the premium that is put on top
22    of that $1 per million which is clear.  It's a no interest
23    transaction.  So at the end of the day, $20 million flowed
24    which allowed all this coal to be mined and sold, not paid
25    for by Justice himself but under the sales proceeds out of a
```

1    premium.

2           There are a number of pockets of profit that

3    you will see.  And what most importantly you will see,

4    Judge, is a coal supply agreement that incorporates the

5    letter agreement and incorporates all of it in the paragraph

6    that, I forget which exact paragraph it is right now, but

7    it is incorporated in that agreement and the letter

8    agreement has a provision in there with cross defaults which

9    reads a cross default to the letter agreement is a default

10   of the coal supply agreement and, likewise, a default of the

11   cross supply agreement is a default of the letter agreement.

12          There is a reason for all that.  And all these

13   issues he raised are factually driven that you haven't had

14   an opportunity to hear from the parties when they entered

15   into this agreement.  And so in looking, and you raised it,

16   and we expected you would, at least by comment if nothing

17   else, about the interdependence of the contracts.  If you

18   look at the case law, and we cited the *Rudman v Cowles*,

19   that is a legal case that strictly says it's a factual

20   determination.  And the quote, I wrote down that case, it

21   is at 280 N.E.2d 867 (N.Y. 1972).  "Whether the parties

22   intended to treat both agreements as mutually dependent

23   contracts, the breach of one undoing the obligations under

24   the other is a question of fact."

25          His *Indesco* case cites four other New York cases

1    that talk about what creates interdependent contracts.  And

2    if ever there were interdependent contracts, this is it.

3           If you look at the letter agreement that talks

4    about how you repay it, it clearly states that it will be

5    repaid pursuant to the terms and conditions of the coal sale

6    agreement which provides exactly how it is done.  And it

7    refers to it in its very face.

8           So I mean you could be absurd and say well there

9    is only one way to be repaid and so we don't owe you

10   anything.  We're not taking that position.  And we're not --

11   I mean we are going to take the position, once you hear all

12   the facts, we believe that the coal supply agreement was

13   breached by the Thrasher parties when they sent the April 10

14   letter in response to the March 29 letter that said there

15   are six areas of we believe nonconformance, noncompliance of

16   the contract and we want assurances that you will perform.

17   And the response was no assurances, but we hereby terminate

18   the contract on April the 10th.

19          So, yes, we do believe they breached the contract

20   by sending that letter.  We do believe that it breached, the

21   coal supply agreement was a breach of the collateral -- I'm

22   sorry, of the letter agreement.  And at the end of the day,

23   we do believe, at the end of the day, that we would have been

24   relieved from collateral obligations, but factually you going

25   to hear that is not the case.

1                You saw the affidavit we attached from Dustin

2     Deane as to what collateral is out there now.  And they're

3     overcollateralized as it sits right now and simply want to

4     ignore the 11-point-whatever million dollars of coal that

5     was shipped that hadn't been paid for.

6                So trying to respond to your questions and not

7     continue to run off at the mouth about factual issues.  I

8     believe all of this is premature.  I believe that what he

9     was hoping he might persuade you to do is ask for a judgment

10    and, just as it says in the prayer for relief, holding the

11    defendants are in breach of their continuing collateral

12    obligations under the letter agreement which neither absolved

13    -- which are neither absolved or reduced by any breach or

14    withheld payment from the separate supply agreement when in

15    fact you haven't heard one tenth of one percent of this case.

16               There are all kinds of factual determinations

17    that are going to have to be made in order for you to

18    determine who was right and who was wrong under what I refer

19    to was a creative workout situation, and all of this is

20    premature at this point.

21               THE COURT:  Has your client changed its behavior

22    with respect to collateral based on my decision in this case

23    at the beginning of the case, primarily the denial of the TRO?

24               MR. BAYLISS:  I didn't understand the first part

25    of your question.

 1              THE COURT:  Has your client changed its position?

 2              MR. BAYLISS:  Oh, no.  Okay.  I am sorry.

 3              THE COURT:  I mean one thing that could be is a

 4    suggestion -- I mean the fact, I suppose.  That is what the

 5    title is.  They say you, your client has misconstrued some

 6    comments or holding that I made at the beginning of the

 7    case and implicitly is treating collateral or its collateral

 8    obligation differently based on what I said.  But I'm not

 9    sure that they even clearly allege that you have changed how

10    you are doing things.  So I'm asking you, have you changed

11    how you are doing things based on your view of what I said

12    or didn't say?

13              MR. BAYLISS:  The answer to that is no.  Their

14    operation might not be as voluminous as it might have been

15    at one day, but they're operating ongoing mines, maintaining

16    stockpiles.  They've made no change in the coal they're

17    mining and the stockpiles they maintain based on anything

18    you have said.

19              I think what is important, if you look at Dustin

20    Deane's affidavit attached to our responsive memorandum, you

21    will see that that answers your question.  And, factually,

22    you are going to have to make some determinations.  The

23    $11 million, is it sitting in an escrow account over there

24    waiting to give it back to us if we're right?  I doubt it.

25    That coal has been sold a long time ago, and that money has

1   been spent, and it has not been applied to the debt at all.

2   I think that is what you are going to find when you hear the

3   facts in this case.  So the collateral requirements I think

4   are much, much, much less than what they -- but to answer

5   your question, there has been no change in the way they do

6   business.

7              We believe there are consequences to acts that

8   might have had prompted a change had they chose to make it.

9   We talked about that today with Mr. Lusk, and I can

10  represent to the Court they have a business to operate and

11  they have to sell coal.  You know what the market is by just

12  reading the paper.  The market is not what it used to be.

13             But to answer that question, there has not been

14  a change.

15             THE COURT:  You made possibilities about working

16  with the Magistrate Judge.  Was that with our Magistrate

17  Judge or was that something that is happening in Virginia?

18             MR. BAYLISS:  No, that is your Magistrate Judge

19  here.  Judge Burke, sir.

20             THE COURT:  Judge Burke.

21             MR. LUCAS:  We have been in touch with him, and

22  we have another call scheduled with him later down the road.

23             THE COURT:  Okay.  Thank you.  Let me give Mr.

24  Lucas a chance to come back.  I mean --

25             MR. LUCAS:  I'll be very limited, Your Honor.

1    And then just to answer whatever additional questions you

2    might have.

3              With respect to your last questions, yes, they

4    have changed their practices.  I can't tell you whether they

5    did it because of your ruling or not.  But did they change

6    them?  Absolutely they have, and the testimony is clear in

7    the deposition of Mr. Lusk.

8              THE COURT:  And give me an example.

9              MR. LUCAS:  Let me give you an example.  Mr.

10   Bayliss sits here today and says we're over-collateralized.

11   That he talks about cross default provisions.  It's all

12   general and it's inaccurate.

13             One of the reasons why you bring a motion like

14   this, the agreement provides, and Mr. Lusk agreed that $10

15   million of collateral has to be in the stockpiles.  There is

16   coal fines that are in a pond.  There is what is called gob

17   out in the field that the parties gave an assigned value

18   for, but it doesn't change, as his testimony makes clear.

19             You need $10 million in the stockpiles when you

20   have taken the $20 million loan.  They have not done that.

21   Mr. Lusk's testimony was we stopped even tracking it.  We

22   stopped replenishing it because we don't have to, because we

23   have concluded, a legal argument, not a factual argument,

24   that you haven't paid us for certain purchase orders of coal

25   under the coal supply agreement.

```
 1              So, yes, they've changed.  Absolutely they've
 2   changed.
 3              THE COURT:  What is it that I could have said
 4   or done or that I did say or did that you think could have
 5   provided a basis for them, wrongly in your view, but to have
 6   changed their view of the contract or the behavior?
 7              MR. LUCAS:  You made a comment, Your Honor, when
 8   we were here, and it's in the transcript.  I don't have the
 9   exact language but I will give you the gist.
10              You were concerned at that point in time whether
11   there was any kind of double counting.  As I recall, that
12   was the term, "double counting."  That this collateral was
13   doing double duty.  And my argument to you, based upon the
14   exact language of the agreement, is once they breached and
15   they repudiated this contract, which they did, then under
16   the agreement, that's defined as an event of default under
17   the coal supply agreement.
18              We, Xcoal, have an express contractual right
19   to suspend performance and not make payment.  That was the
20   contractual right we had.  We said you need to look.  And
21   it's inner related to what we're talking about today.  You
22   need to look at these cross default provisions.  These
23   provisions provide us, not you, with that remedy.  And we
24   are exercising a specific remedy under the coal supply
25   agreement.
```

1          When we were here the first time, Your Honor,

2    back in May of last year, you specifically indicated -- and

3    it wasn't a ruling, but you looked at this and there was a

4    serious question whether the Justice parties, on April

5    the 10th, had a repudiated the contract.

6          So keep that in mind.  We are exercising a

7    specific right that was under the contract but there was

8    this question about, well, is it double counting because

9    I don't know what your damages are under the coal supply

10   agreement, was sort of your comment.

11          Mr. Bayliss also said, well, there is cross

12   default provisions here, Your Honor.  That is the problem.

13   You have got to look at the specifics.  Because they're not

14   reciprocal cross default provisions, giving them, the Justice

15   parties, if you will, the defendants in the Delaware action,

16   these rights.  They are limited, different, nonreciprocal, and

17   give them no remedy.

18          We laid this out in our briefs, but I'm looking

19   the coal supply agreement has a limited cross default

20   provision that doesn't provide remedies that both sides

21   have.  It says in the event of default by the seller -- that

22   is them -- under the letter agreement, shall be in event

23   of default under this agreement gives us, and only us, the

24   right.

25          Then under the letter agreement, it does say, in

1   the event of default under one is the event of a default under

2   the other but only gives us the rights and the remedies, not

3   them.

4          This is the problem.  I mean I realize you put

5   me on the defensive today with your questions, fair enough.

6   But for me to sit here and listen essentially to a closing

7   argument about what is going to happen in the event, we

8   all agreed that there is a fundamental dispute here, who

9   breached the coal supply agreement.  We all agree that they

10  signed a mutual release and voluntarily dismissed their case

11  back in 2012.  We agree they took $20 million.

12         So I won't address those.  If, and when, we

13  ever get to those issues, we'll get to those issues.  But

14  the issue that we presented to you is a narrow, focused

15  issue.  And that is if you look at these two agreements and

16  you look at the remedy and default provisions, there is no

17  basis, and you can decide this as a matter of law, where

18  they can allege a breach by us of the coal supply agreement

19  and justify their reduction of collateral under the letter

20  agreement.

21         I mean Mr. Bayliss and I are going to fight

22  about a lot of things in this case.  I mean I like

23  Mr. Bayliss, I think he more or less likes me, and we will

24  fight about a lot of things but I can't imagine we're going

25  to fight about what I'm going to say to you right now.

1          Since this lawsuit has been filed, and we

2    initially came down to see you, there has probably never,

3    on any weekly basis, been more than $2 million in the

4    stockpiles that are supposed to be $10 million.  They can

5    argue they should get credit for something else or they can

6    argue legally they're entitled to reduce those obligations.

7    But, factually, that's not something, I think I feel pretty

8    comfortable in saying, that we're going to actually dispute

9    when the time comes.  And we send someone down there that

10   looks on a regular basis at these stockpiles.

11          So, yes, they've changed.  To get back to your

12   question, $10 million in the stock pile.  Now, if you look

13   on a week to week basis, it's somewhere between $1 and $2.

14   That is a significant serious breach, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          Mr. Bayliss, is there anything you want to add?

17          MR. BAYLISS:  One point.  I don't think we'll

18   argue about everything.  Just like he said.  But you asked the

19   question, did anything change as far as any comment you made?

20   And I answered what I believed is the right and honest answer.

21   They didn't change the way they did business.  And he said

22   there would always be $2 million.  It's been a constant number

23   in the stockpile.  But if you look at Dustin Deane's e-mail, I

24   mean affidavit, paragraph 14, that amount includes $10 million

25   in Bishop fines coal and Bishop midlevel coal and

1    approximately $3.2 million in stockpile.  So it's not $2

2    million, it's a lot --

3             THE COURT:  But the amount in the stockpile,

4    by which I don't mean a legal stockpile, I mean an actual

5    physical pile that plaintiffs are looking at on occasion

6    they tell me, that amount isn't constant, it's changing on a

7    regular basis.

8             MR. BAYLISS:  It changes in that they mine and

9    then they sell it, and they mine it and sell it.  So they

10    didn't make any changes as a result of anything you said.

11             THE COURT:  But is the size of the pile

12    materially different?

13             MR. BAYLISS:  Well, again, it's more than one

14    pile; and there are factual issues of what constitutes the

15    stockpile as to coal and pit, et cetera.  So there will be

16    factual disputes, but it's not just one pile, and it does

17    change in that they do sell product.

18             THE COURT:  Is it more on the order of about $2

19    million worth of coal now whereas it was more on the order

20    of that $10 million in coal back at the time this case first

21    came to me?

22             MR. BAYLISS:  I don't -- I can't answer the

23    question about what it was when it first started.  I cannot

24    answer that question.  I can only answer what I know as

25    of -- because the last time we looked at that issue was

1    May the 4th.  When that affidavit was signed, it was

2    $3.2 million and the stockpile at that point.

3              THE COURT:  But to the extent part of the reason

4    the plaintiffs asked me to look at this is a belief that you

5    all have changed your behavior in terms of the size of the

6    physical stockpile or piles based on something I said or

7    did at the earlier hearing, you are able to represent to me

8    that has not occurred.

9              MR. BAYLISS:  That's correct.

10             THE COURT:  Okay.  Thank you.

11             Mr. Lucas, I'm not going to get any further

12   into the merits, but is there anything else you want to say

13   before I make a decision?

14             MR. LUCAS:  If I could just on this point, Your

15   Honor, as a general matter.

16             That is, this motion that we presented does not

17   require you to decide any disputed factual issues.  So, for

18   example, it presents a legal question.  It doesn't require

19   you to decide how much qualified coal collateral is in the

20   stockpile.  But there are terms for the stockpile.  It's a

21   legal issue.  It's a defined term.  It's not things that are

22   in a pit somewhere.  It's defined.  But you don't have to

23   decide that for purposes of this motion.

24             You don't have to decide for purposes of this

25   motion who, which side breached the coal supply agreement.

1    And as we have talked about, you don't need to decide whether

2    injunctive relief is appropriate.  So as I said, Your Honor,

3    it seems to me we are trying to present an issue that has to

4    be resolved in this issue anyway.  It's a fundamental part of

5    the case.  We believe it is a legal issue under the governing

6    law for you to decide, and it is presented at this point in

7    time, Your Honor.  We would certainly hope that Your Honor

8    would consider it based upon the briefing.

9            THE COURT:  All right.  Thank you.  Well, let me

10   give you my ruling.

11           As I don't think will be surprising, I'm denying

12   the motion for motion to clarify collateral obligations.  And

13   I'm doing it -- and I want to hopefully be clear on this.  I'm

14   doing it on case management and procedural grounds.

15           As I outlined at the beginning, I don't think there

16   is any specific rule basis for a motion for a clarification of

17   collateral obligations.  That is really a minor point.  This

18   is basically, I think it's now well understood, a motion for

19   partial summary judgment, as the plaintiffs have made clear

20   in their reply brief and again today.

21           I have a schedule in place, and that schedule

22   may or may not be ideally suited to everybody's interests or

23   anybody's interests in this case, but it is an Order of the

24   Court.  It sets out a date for summary judgment briefing,

25   and it sets out a procedure for seeking leave to file early

1     summary judgment briefing.

2              I can tell you the reason we have that type of

3     provision is because I do have other cases.  I can only give

4     each case so much time, and I need to generally be able to

5     plan when I'm going to have to dig in and give a particular

6     case time and attention.  And as difficult as that already

7     is, if we get even proper summary judgment motions on an

8     unexpected basis at any time in one case, it throws us off

9     trying to handle the other 700 civil cases I have and the

10    other 300 motions I have on my docket.  So that is the main

11    grounds on which I am denying the motion because I see it

12    as an untimely motion for summary judgment.

13             Now, that said, I'm not making a finding as to

14    whether or not there are underlying factual disputes.  That

15    would provide another basis for denying the motion.  It may

16    well be that there are underlying factual disputes.  It may

17    be that I might have to, in order to resolve this motion,

18    decide if the various agreements are intended to be mutually

19    dependent or not.  And that, under New York law, as I

20    understand it, would likely be a factual question.  It might

21    be I'd have to make some decisions or make some factual

22    findings or deal with factual issues as to the parties

23    intent on other grounds.

24             Perhaps there might be factual disputes as to

25    where the stockpiles are and whether the defendants behavior

1    has changed, and, if so, why over the last year or how much

2    coal is in a particular pile.  I don't know.  And I'm not

3    making any finding on that point.

4            But I am told by defendants that if this were

5    a timely motion for summary judgment, they would oppose it

6    based on the fact that discovery has not been completed and

7    that they need to do more discovery.  So I'm aware of that

8    but again I rule based on case management grounds.

9            While I have denied the motion, and so I don't

10   know that I need this as clarification or not, I think it's

11   clear -- I looked at the transcript again in preparation for

12   today from our hearing last May -- I don't think I addressed

13   the merits at all of the disputes between the parties, I

14   ruled based on the failure to show irreparable harm.

15           So I accept the representation from defendants

16   that they have not changed their behavior based on anything

17   I said or did or didn't say or didn't do, but I do think

18   a fair reading of the transcript makes it clear I didn't

19   decide anything about anybody's collateral obligations or

20   any other merits-related issues.  So I hope that that is

21   clear.

22           Going back to case management, as Delaware

23   counsel can probably tell you, there is a common practice

24   in this court that a case that is going to be tried to the

25   bench ultimately that we don't allow any summary judgment

1    motions at any time.  Since we, as the judges, are going to

2    be the fact-finders, for various reasons, it's generally

3    the practice that we say:  get discovery done, boil down

4    the issues, bring in your witnesses, and I'll resolve all

5    legal and factual issues together in that context.

6                 Now, in this case, I believe the schedule that

7    I signed, as I pointed out, has a date for summary judgment

8    motions.  And I'm not, at this point, taking that away from

9    you.  But I think that is an important context to understand

10   as a further reason for why I have reached the decision I

11   have today.

12                Again, I'm not modifying the scheduling order

13   and taking away your right to file case dispositive motions,

14   but I would suggest to you, particularly as I know we now

15   have the new case here and we can talk about that in just a

16   moment, might not it be best for everyone to figure out how

17   to get discovery done and get this case to trial as quickly

18   as possible and tell me the story you want to tell me.

19   And I recognize I'm not trying to run from it.  I recognize

20   I'll have to make factual findings, I'll have to make legal

21   rulings, and I should do that so that you all can do

22   whatever you do with that.  So perhaps we should work

23   together to make that day come even more quickly.

24                One final thing, and then I'll turn it back to

25   you all.  We do have excellent Magistrate Judges here, and

1    they spend a lot of time helping parties resolve disputes

2    as big and as complex as this one appears to be, and some

3    that are probably more so in both regards, and many that are

4    simpler.

5              I would certainly encourage you all to make

6    whatever use you can of Magistrate Judge Burke.  He has a

7    lot of experience helping resolve, again, very complex cases.

8              So all that said, the motion for clarification

9    is denied.

10             I did receive the letter that I had ordered you

11   all to submit in light of the fact that the transfer case is

12   now with me, and I do want to talk about that.

13             It seemed to me happily -- hopefully, I won't mess

14   this up.  It seemed to me like you weren't all in disagreement

15   and you were generally in agreement as to how we should proceed.

16   I'm hoping that is the case.  Let's talk about that, and tell

17   me how I can help you and how we can get these cases moving in

18   a direction everyone is comfortable with.

19             I guess first Mr. Lucas.

20             MR. LUCAS:  Your Honor, the letter hopefully

21   says, I think Mr. Bayliss and I -- I don't want to misstate,

22   but I think he and I are in agreement in general.  And I

23   went back and looked in preparation for this to the Report

24   and Recommendations down at the Western District of

25   Virginia.  And the comment in part there was that, talking

1     about the two cases and whether they should be in the same

2     or whether there is potential for inconsistent verdicts.

3     They noted that if the Justice parties, I'll call them that,

4     if they were to succeed in their action, their reformation,

5     not reformation, their rescission action, there would be no

6     reason to determine damages under the coal supply agreement

7     since they are seeking to rescind it.

8            So, in essence, Mr. Bayliss and I talked about

9     it.  I think we are both in agreement that it is a

10    sequencing-type arrangement where we go forward and decide,

11    I'm going to call it more simplified the liability issues

12    including entitlement to rescission and put off the remedy

13    or damages issue and keep our trial date.

14            We're proceeding.  We're exchanging dates on

15    discovery.  We'll be doing our discovery and that, and get

16    the liability matters done.  If you decide in favor of the

17    Xcoal parties, that it was, if you will, the Justice parties

18    who breached or otherwise there is no basis for rescission,

19    then we can deal with damages at that point.

20            If, on the other hand, you decide in favor of

21    the Justice parties that there is some rescission that is

22    justified, there was no purpose for you to determine the

23    contested factual issue of the amount of damages under the

24    coal supply agreement.

25            So I think that is what Mr. Bayliss and I

1    proposed.  And in the letter, it was if this is something that

2    the Court is receptive to, it is something we think, the two

3    of us think makes sense and is a good way to handle the case.

4              THE COURT:  Okay.  Mr. Bayliss.

5              MR. BAYLISS:  The only thing I will add to that,

6    Judge, is that I think that, procedurally, what we talked

7    about is that there is no way these cases shouldn't be tried

8    with both consolidated.  They all arise over the same thing.

9    So for both discovery and trial purposes, that they be

10   consolidated.

11             Where we have a little bit of a hang-up and

12   where we invited you to maybe weigh in, we did talk about the

13   bifurcation issue and we didn't really reach consensus there.

14   And I still don't know whether that is the best way to do it

15   or not.  I think that clearly for case management purposes,

16   it ought to be consolidated.  And I don't know whether you

17   bifurcate cases regularly or that is something unique to you

18   or what, but that is where we kind of hadn't really reached a

19   complete understanding on.

20             THE COURT:  Well, sometimes we bifurcate,

21   sometimes we don't.  We see all kinds of cases here, and

22   I'm of a big believer in doing what is seems right for the

23   particular case.  So to the extent you are not sure about

24   bifurcation because you're not sure if I'll agree to it, I

25   wouldn't worry about that.

1          MR. BAYLISS:  Okay.

2          THE COURT:  To the extent you have a concern

3    that it is not the appropriate procedure or it will

4    prejudice your client or you have some other concern, I'm

5    happy to hear that.

6          MR. BAYLISS:  Well, let me make a suggestion so

7    we don't put it off.  What I would ask the Court to do is to

8    agree to consolidate the cases for discovery and trial and

9    that the two of us can either agree to bifurcate or not

10   agree to bifurcate within 10 days and let the Court know

11   whether we have an agreement.  And if one of us wants to

12   bifurcate and the other one doesn't, they can file a motion

13   to bifurcate and then you can rule on it.

14         MR. LUCAS:  Your Honor, the only qualification or

15   change to that is I have no problem for doing a consolidation

16   for purposes of discovery.  Until we know how we're going to

17   try, what we're going to try, it makes no sense to me at this

18   point to bifurcate for purposes of trial.  So I certainly

19   would agree to consolidation for purposes of discovery the two

20   cases and have Mr. Bayliss and I get back to you in 10 days as

21   to the trial aspect.

22         THE COURT:  Right.  Let's do that then.  So get

23   me, by the end of the week, an order that would consolidate

24   at least for discovery purposes.  If you have reached some

25   other agreement by the end of the week, that's fine.  Go

1    ahead and put that in your proposed order.

2              At a minimum, I do want to get the cases

3    consolidated for discovery purposes, which that is without

4    prejudice to further consolidation if that is what either

5    you or I determine is appropriate.  Ten days it seemed to me

6    would probably be a week from Friday.  So report back to me

7    by the end of next week as to where you are on bifurcation

8    or bifurcation of trial and/or consolidation --

9              MR. BAYLISS:  Right.

10             THE COURT:  -- of the cases for further

11   purposes, and get me the proposed order or a status report

12   that explains to me here is what I should sign or here is

13   the parties' position.

14             Is any question about that, Mr. Lucas?

15             MR. LUCAS:  No, Your Honor.

16             THE COURT:  Mr. Bayliss.

17             MR. BAYLISS:  No, sir.

18             THE COURT:  Is there anything else we should

19   talk about?

20             MR. LUCAS:  No, I don't think so.  I appreciate

21   your time.  And to the extent we disrupted the normal

22   scheduling, obviously that was not our intention, but I do,

23   especially being pro hac admitted, I appreciate being here

24   so I do want to apologize for that.

25             THE COURT:  No need to apologize.  Thank you.

1               Is there anything further from defendants?

2               MR. BAYLISS:  No, sir.

3               THE COURT:  All right.  We will be in recess.

4    Thank you.

5               (Oral Argument hearing ends at 4:07 p.m.)

6

7          I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

8

9                              /s/ Brian P. Gaffigan
                              Official Court Reporter
10                             U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25